Submitted May 27, 2015, affirmed June 8, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CAMERON WHITTEN,
*Defendant-Appellant.*

Multnomah County Circuit Court
120343081; A153369

379 P3d 707

Steven J. Sherlag filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Patrick M. Ebbett, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Tookey, Judge.

## SERCOMBE, P. J.

Defendant appeals a judgment of conviction for failing to obey a police officer, ORS 811.535, a traffic violation.[1] Before he was charged with that traffic violation, defendant was charged with interfering with a peace officer, ORS 162.247, a misdemeanor,[2] but that charge was dismissed on the state's motion. In his sole assignment of error, defendant argues that the trial court erroneously ruled that he was not entitled, in the traffic violation proceeding, to constitutional protections provided to defendants in "criminal prosecutions" pursuant to Article I, section 11, of the Oregon Constitution and the Fourteenth Amendment to the United States Constitution, including the right to a jury trial and to have the charge proved beyond a reasonable doubt. According to defendant, he was entitled to those protections because the traffic violation proceeding was effectively a "criminal prosecution." On review for errors of law, *State v. Rangel*, 328 Or 294, 298, 977 P2d 279 (1999), we conclude that the trial court correctly determined that defendant's traffic violation proceeding was not a "criminal prosecution" and affirm.

The relevant facts are procedural and undisputed. Defendant was initially arrested for the misdemeanor crime

---

[1] ORS 811.535 provides:

"(1) A person commits the offense of failing to obey a police officer if the person refuses or fails to comply with any lawful order, signal or direction of a police officer who:

"(a) Is displaying the police officer's star or badge; and

"(b) Has lawful authority to direct, control or regulate traffic.

"(2) The offense described in this section, failing to obey a police officer, is a Class B traffic violation."

[2] ORS 162.247 provides, in part:

"(1) A person commits the crime of interfering with a peace officer or parole and probation officer if the person, knowing that another person is a peace officer or a parole and probation officer as defined in ORS 181A.355:

"(a) Intentionally acts in a manner that prevents, or attempts to prevent, a peace officer or parole and probation officer from performing the lawful duties of the officer with regards to another person; or

"(b) Refuses to obey a lawful order by the peace officer or parole and probation officer.

"(2) Interfering with a peace officer or parole and probation officer is a Class A misdemeanor."

of interfering with a peace officer while he was participating in a march with other members of the Occupy Portland protest movement. After defendant was arrested, booked, and briefly detained, the state elected to try defendant's interfering with a peace officer charge as a violation. *See* ORS 161.566(1) ("[A] prosecuting attorney may elect to treat any misdemeanor as a Class A violation.").

Pursuant to ORS 153.076, certain constitutional protections that apply in criminal prosecutions do not apply in violation proceedings. In particular, ORS 153.076(1) and (2) provide that "[v]iolation proceedings shall be tried to the court sitting without jury" and that "[t]he state * * * shall have the burden of proving the charged violation by a preponderance of the evidence." In contrast, in a criminal prosecution, Article I, section 11, provides the accused with the right to a jury trial and the Fourteenth Amendment mandates that the state prove the defendant's guilt beyond a reasonable doubt.[3] *See Brown v. Multnomah County Dist. Ct.*, 280 Or 95, 98-99, 570 P2d 52 (1977) (explaining that the "guarantee [of] proof beyond a reasonable doubt" is "required by due process under the federal 14th amendment not only in criminal prosecutions but in other proceedings of similar character").

Defendant—along with other members of Occupy Portland who had been arrested for various misdemeanor crimes that the state elected to treat as violations—moved for the application of those constitutional protections to the charges that were reduced to violations. Defendant argued that the violation proceeding was effectively a "criminal prosecution" because it retained too many penal characteristics to properly be considered a civil proceeding. The trial court agreed and granted the motion. Following the trial court's decision, the state dismissed the misdemeanor charge. It then charged defendant in a new information with the Class B traffic violation of failing to obey a police officer. The information pleaded the same conduct that formed the basis of the original misdemeanor charge.

---

[3] Article I, section 11, provides, in part, that, "[i]n all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *."

With respect to the new charge, defendant moved—along with other Occupy Portland defendants—for the application of state and federal constitutional procedural protections in his traffic violation proceeding, again arguing that the violation proceeding was effectively a "criminal prosecution." The trial court denied the motion in a written order:

"*III. Fail to Obey a Police Officer and other offenses defined by law as violations*

"Subsequent to this court's order granting Article I, Section 11 provisions for Class A and B misdemeanors reduced to violations, the District Attorney's office dismissed those cases and issued different charges for the same conduct at issue in the prior case. All of the charges brought were offenses defined as violations. The defendants were subject to pre-trial arrest for the first charge, but not the subsequent violation charge. There is no inherent stigma in being charged with an offense that may have overlapping tones of an accusation of a crime. The issue is whether society would assume it was a crime based on its historical treatment in the community along with other factors. Being originally subject to pre-trial procedures for the first charge is not sufficient to render the violation a criminal prosecution. The court does not grant the motion for court-appointed attorney and jury trial as to these offenses."

Defendant subsequently was tried to the court and found guilty of the traffic violation by a preponderance of the evidence.

The issue on appeal is whether the trial court properly concluded that defendant's traffic violation proceeding was not a "criminal prosecution" for purposes of the criminal trial protections provided by Article I, section 11, and the Due Process Clause to the Fourteenth Amendment. To make that determination, we apply the test set out by the Supreme Court in *Brown*, 280 Or at 102-06, and recently reaffirmed by the court in *State v. Benoit*, 354 Or 302, 311 P3d 874 (2013), and *State v. Fuller*, 354 Or 295, 311 P3d 861 (2013). The parties agree that those cases supply the proper framework for analyzing whether an ostensibly civil proceeding is actually a "criminal prosecution" to which criminal constitutional protections apply, but they disagree on the correct outcome.

In *Brown*, the court considered the legislature's attempt to classify a first offense for driving under the influence of intoxicants (DUII) as a noncriminal "traffic infraction" to which criminal constitutional protections did not apply. 280 Or at 97. The defendant was charged with that offense and moved for an order appointing counsel, granting him a jury trial, and requiring the state to prove the elements of the offense beyond a reasonable doubt, which the trial court denied. *Id.*

On appeal, the Supreme Court noted that there is "no easy test for when the imposition of a sanction is a 'criminal prosecution' within the meaning of the constitutional guarantees." *Id.* at 101-02. However, if the legislature chooses to define conduct as a criminal offense, "it is a criminal offense for constitutional purposes even if the same consequences could have been attached to the same conduct by civil or administrative proceedings." *Id.* at 102. On the other hand, the legislature cannot deny the defendant the constitutional protections required in criminal prosecutions "simply by avoiding the term 'criminal'" when it defines an offense. *Id.*

The court then set out five factors for determining whether an "ostensibly civil penalty proceeding remains a 'criminal prosecution' for constitutional purposes": (1) the type of offense, including whether the offense was a crime at common law or whether it involves traditional elements of *mens rea* or a lower degree of culpability; (2) the potential penalties arising from a conviction, specifically whether there is a potential for imprisonment or a heavy fine; (3) the collateral consequences arising from a conviction; (4) the "punitive significance" of a conviction; and (5) whether the pretrial procedures associated with a criminal proceeding, including arrest and detention, are allowed. *Id.* at 102-08. All of those factors "are relevant, but none is conclusive." *Id.* at 102. After applying that test to a first-offense DUII, the court concluded that the offense retained "too many penal characteristics not to be a 'criminal prosecution' under article I, section 11 of the constitution[,]" and the defendant was therefore "entitled to the protections of this and other sections governing criminal prosecutions, including the right to representation by counsel." *Id.* at 109.

In *Benoit* and *Fuller*, the Supreme Court applied the five-factor test set out in *Brown*. *Benoit* involved a protestor charged with criminal trespass, initially charged as a misdemeanor but later reduced to a Class A violation by the prosecutor's election under ORS 161.566(1). 354 Or at 304. Similarly, *Fuller* concerned a defendant charged with attempted first-degree theft and third-degree theft, also initially charged as misdemeanors but reduced to Class A violations by prosecutorial election. 354 Or at 297. In both cases, the court concluded that the violation offenses retained too many penal characteristics to not be characterized as "criminal prosecutions."

Here, based on the five-factor test articulated in *Brown*, we conclude that the proceeding for defendant's violation for failing to obey a police officer was not a "criminal prosecution." The first factor, the type of offense, weighs against defendant. An offense might have certain characteristics that suggest that the legislature classified the offense as civil to create a "procedural short-cut[]" in prosecuting the offense rather than reflecting "a genuine change in the public assessment of the conduct." *Brown*, 280 Or at 102. In particular, that is likely where the offense was "a crime at common law, or at the time the constitution was adopted, or for a long time thereafter" and where culpability for the offense "involve[s] traditional elements of mens rea." *Id.*

Failing to obey a traffic control police officer under ORS 811.535 was not a crime at common law and, like other traffic offenses, was not traditionally regarded as a criminal act. As the *Brown* court explained, traffic offenses are "largely a 20th-century phenomenon" and, although they were initially "assigned to courts in criminal form[,]" that was likely "as much because the form was familiar and the courts available as by any deliberate choice among alternatives." *Id.* at 103. Therefore, that prior criminal treatment "does not prevent a later decision not to treat traffic offenses as crimes." *Id.* In contrast, where the legislature attempts to decriminalize conduct traditionally regarded as a crime, courts are less likely to respect that classification for purposes of criminal constitutional protections. *See Fuller*, 354 Or at 300 (concluding that the "type of offense" factor weighs in favor of finding violation proceedings for theft to

be a criminal prosecution, in part, because "the prohibition against theft predates our common law" (internal quotation marks omitted)). Thus, although prior to the 1975 revision to the Vehicle Code, the same conduct at issue in this case was punishable as a crime, *see former* ORS 483.048 (1973), *repealed by* Or Laws 1975, ch 451, § 291 (proscribing "refus[ing] or fail[ing] to comply with any lawful order, signal or direction of any traffic or police officer displaying his star or badge and invested by law with authority to direct, control or regulate traffic"); *former* ORS 483.990(1) (1973), *repealed by* Or Laws 1977, ch 882, § 75 (making violation of ORS 483.048 punishable by a period of incarceration in county or municipal jail), as with other traffic offenses, the legislature's decision to regulate the conduct by noncriminal means since the revision to the Vehicle Code in 1975 does not indicate that it did so in an attempt to skirt criminal constitutional protections. *See Brown*, 280 Or at 102-03; *see also former* ORS 487.100 (1975), *repealed by* Or Laws 1983, ch 338, § 978 ("failing to obey a police officer" was a Class C traffic infraction); Or Laws 1983, ch 338, § 663 (promulgating "failing to obey a police officer" as a Class C traffic violation); Or Laws 1995, ch 383, § 79 (amending ORS 811.535 to change the classification of the offense from a Class C to a Class B traffic violation).

ORS 811.535 does not require a criminal state of mind as a necessary element of the offense. Defendant argues that ORS 811.535 requires the state to prove an element of *mens rea*, because, according to defendant, "one cannot 'refuse' to comply with a lawful order without some type of willful action. This is not a pure 'strict liability' offense, there has to be some machination of intent, or knowledge, since * * * the act of 'refusing' implies such." Although "refuse" may imply a culpable mental state, *cf. State v. Enyeart*, 266 Or App 763, 340 P3d 57 (2014) (construing "refuse" in ORS 162.247 to imply a "conscious intention to violate a directive" that is "consistent with an intentional culpable mental state"), here, ORS 811.535 is phrased in the disjunctive, providing that a person commits the offense if the person either "refuses" *or* "fails" to comply with a lawful order. Thus, a person can commit the offense by "fail[ing]" to comply with an order, and the state need not prove any culpable mental

state to prove that a person "fail[ed] to comply." Rather, if the state proves that the person *did not* comply with the order, then the person committed the offense, regardless of his or her mental state. *See Webster's Third New Int'l Dictionary* 814 (unabridged ed 2002) (the relevant definitions of "fail" are "to neglect to do something : leave something undone : be found wanting in not doing something—used with infinitive"; and "to leave some possible or expected action unperformed or some condition unachieved"). Thus, there is no indication by the history or nature of the offense that the legislature classified ORS 811.535 as a violation, but retained characteristics that would ordinarily be associated with a criminal offense, in order to provide the state with a shortcut around criminal constitutional procedures.

The second *Brown* factor, the penalty, also weighs against defendant. A person cannot be imprisoned for a civil offense; "the punitive use of detention" is a penalty that can be imposed only for a criminal offense. *Brown*, 280 Or at 103. However, when an offense does not carry the possibility of imprisonment, the penalty may still indicate that the offense is criminal in nature if that penalty is sufficiently severe as to have the same "punitive significance" as imprisonment. *Id.* at 104.

At the time that defendant committed the offense, the maximum fine for failing to obey a police officer was $360. *See* ORS 153.018(2)(b) (2010), *amended by* Or Laws 2011, ch 597, §§ 7, 332 (amendment to increase the maximum fine for a Class B violation to $1,000 went into effect on January 1, 2012, and defendant committed the offense on December 16, 2011). Although a "large fine may be as severe, in practical terms, as a short imprisonment, and so strikingly severe as to carry the same punitive significance," *Brown* 280 Or at 104, a $360 fine does not rise to that level. Rather, a $360 fine is comfortably within the range that indicates a regulatory, rather than a punitive, purpose. *See State v. Warner*, 342 Or 361, 374, 153 P3d 674 (2007) (describing a $300 fine as "a small one—inconvenient to pay, but far less so than potential penalties for such things as expanding one's garage without a building permit"); *State v. Page*, 200 Or App 55, 63, 113 P3d 447, *rev den*, 339 Or 450 (2005) (concluding that a $600 fine for driving while suspended "is

not excessive in light of its civil purpose" of deterrence);[4] *see also Brown*, 280 Or at 105 (describing a $1,000 fine as "at the margin of legislative discretion" dividing a civil from a criminal penalty, and as "strong evidence of the punitive significance" that the legislature intended the fine to have); *State v. Fuller*, 252 Or App 391, 287 P3d 1263 (2012), *aff'd*, 354 Or 295, 311 P3d 295 (2013) (noting that, "considered in light of inflation," as of 2012, a $1,250 fine could properly be imposed in a civil proceeding). Thus, the relatively small fine imposed for violation of ORS 811.535 suggests that the offense should not be classified as a crime.

With respect to the third factor, "collateral consequences," defendant does not identify, nor do we discern, any collateral consequences that follow from a conviction under ORS 811.535. Therefore, that factor weighs against defendant.

The fourth factor, the "punitive significance" of the offense, requires that the court determine whether the offense "carries stigmatizing or condemnatory significance." *Brown*, 280 Or at 106. As the *Brown* court noted, this factor is notoriously "difficult[]" to evaluate, because "the significance of a law may differ in the eyes of legislators, of defendants, and of the general public," and, moreover, those "views can change with time." *Id.*; *see also Fuller*, 354 Or at 301 n 4 (explaining that "determining the punitive significance of violation-level theft convictions" would be unhelpful because the inquiry is "fraught with difficulty"). However, the *Brown* court ultimately concluded that the "decriminalized" first-offense DUII carried a "stigmatizing or condemnatory significance," primarily because the legislative history of the Oregon Vehicle Code revealed that the drafting committee "was at pains to point out that it did not regard [the] offense as less serious than reckless driving and others that remain[ed] 'major' or 'serious' offenses, triable as

---

[4] *Warner* and *Page* involved the issue of whether violation proceedings triggered the former jeopardy bar under Article I, section 12, of the Oregon Constitution, which provides that "[n]o person shall be put in jeopardy twice for the same offence * * *." To determine whether an offense that is classified by the legislature as a violation is actually "criminal in nature" for former jeopardy purposes, the Supreme Court has adopted four out of the five factors—all except the "type of offense" factor—set out in *Brown*. *State v. Selness/Miller*, 334 Or 515, 536, 54 P3d 1025 (2002).

crimes." *Brown,* 280 Or at 107; *see also id.* (the committee stated that the classification of a first-offense DUII as a non-criminal offense "[b]y no means should * * * be misread as de-emphasizing the serious nature of the offense or as being 'soft' on the drinking driver" (internal quotation marks omitted)). As discussed above, failing to obey a police officer originated from the same revision of the Vehicle Code that was at issue in *Brown.* In contrast to first-offense DUII, the committee's report does not include any indication that it considered failing to obey a police officer to be any more serious than its then-designation as a Class C infraction implied.

Defendant asserts that ORS 811.535 has a stigmatizing effect because "failing [to obey] an officer's direction is more akin to the criminal sphere than traffic." However, defendant cites no authority to support that argument, and, given that the offense is situated in the "rules of the road" section of the Vehicle Code and relates specifically to orders from a police officer with "lawful authority to direct, control or regulate traffic," it is not very persuasive. Furthermore, because the offense has not traditionally been considered to be a crime—and in the absence of any revealing legislative history—we do not conclude that the offense carries a stigmatizing or condemnatory significance.

Finally, defendant argues that the fact that he was subjected to pretrial criminal procedures for the interfering with a peace officer misdemeanor charge, prior to its dismissal, indicates that the subsequent violation proceeding was a "criminal prosecution." According to defendant, "the stigma of arrest and incarceration * * * has not been 'washed' from defendant by the dismissal and subsequent institution of a traffic offense." The *Brown* court explained that the legislature's decision to make traffic offenders, including first-offense DUII offenders, subject to pretrial arrest and detention "beyond the needs of identifying, citing, and protecting the individual * * * comports with criminal rather than with civil procedures and is surely so perceived by the public." 280 Or at 108. Subsequently, in both *Benoit* and *Fuller,* the Supreme Court emphasized the fact that, before the state elected to treat the misdemeanors in those cases as violations, the defendants had been subjected to arrest,

booking, and detention, which are unique to criminal prosecutions. *See Benoit*, 354 Or at 316 (explaining that "[n]o subsequent election by the state to purportedly decriminalize the charge can change the fact that defendant was subjected to those uniquely criminal procedures and their stigmatizing effect"); *Fuller*, 354 Or at 300 (same). As the *Benoit* court further explained:

> "After the state's election, this case proceeded as the same action, for the same offense, with the same elements and the same maximum potential fine. The state merely proposed to change the remaining pretrial and trial procedures and eliminate the possibility of imposition of a 30-day jail sentence. There is no textual, historical, or logical support for the proposition that, for purposes of Article I, section 11, what began as a criminal proceeding with defendant's arrest, booking, and incarceration for a crime can, in the absence of her consent, be transformed without further constitutional consequence into a noncriminal proceeding."

354 Or at 317.

Here, defendant was subjected to criminal pretrial procedures, including arrest, booking, and detention, when he was initially charged with the crime of interfering with a peace officer. However, in clear contrast to *Benoit* and *Fuller*, the state did not merely reclassify the offense from a crime to a violation, eliminating the possibility of jail time but proceeding in the "same action, for the same offense, with the same elements and the same maximum potential fine." *Benoit*, 354 Or at 317. Instead, the state dismissed the misdemeanor charge and instituted a new action for a different, albeit similar, offense. Arrest, booking, and pretrial detention were not available for failing to obey a police officer under ORS 811.535. *See* ORS 810.410(3)(a) (providing that police officer "[s]hall not arrest a person for a traffic violation"); ORS 153.039(3) (providing that a person may be detained in the course of a stop for a violation "only as long as is necessary to: (a) [e]stablish the identity of the person * * * believed to have committed the violation; (b) [c]onduct any investigation reasonably related to the violation; and (c) [i]ssue a citation for the violation"). Moreover, the state eliminated more than the possibility of incarceration by selecting the lesser charge. Rather, after dismissing the

misdemeanor charge, the state charged defendant with an offense for which the maximum fine ($360) was only a small fraction of the maximum fine that could have been imposed upon conviction for the initial charge ($6,250). ORS 161.635(1)(a). Thus, the failure to use, as well as the inability to use, pretrial criminal procedures in connection with prosecution of the ORS 811.535 offense does not weigh in defendant's favor.

For the foregoing reasons, we conclude that defendant's proceeding for failing to obey a police officer was not a "criminal prosecution" for which criminal constitutional protections were required. Accordingly, the trial court did not err in denying defendant's motion for the application of those constitutional protections in his case.

Affirmed.